## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 16-CR-10018-IT** |
| | ) | |
| ANTHONY PANTONE, | ) | |
| Defendant. | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

## I.   BACKGROUND

On January 21, 2016, a one-count Indictment charging Anthony Pantone ("Pantone" or "defendant'), with one count of one count of Armed Bank Robbery, in violation of 18 U.S.C. §§ 2113(a),(d) and § 2, was returned; as well as a Forfeiture Allegation pursuant to 18 U.S.C. §§ 981(a)(1)(C), 924(d) and 28 U.S.C. §2461(c).   On May 10, 2016, Pantone entered a guilty plea before this Honorable Court.[1]   In the afternoon hours of October 9, 2015, with their faces partly covered, Pantone and another individual, later identified as Russell Dinovo, entered the Hingham Institute for Savings Bank on Charles Street in Boston, and, with Pantone holding an airsoft fake gun, the men robbed the bank of $16,320.95, and ordered the bank tellers to the ground before fleeing.[2]

U.S. Probation has calculated Pantone's total offense level as follows:   a base offense level ("BOL") of 20 per USSG §2B3.1; an additional 2 level increase per USSG §2B3.1(b)(1) because the property of a financial institute was taken; and an additional three level increase in accordance with USSG §2B3.1(b)(2)(E) because a dangerous weapon was brandished or possessed.   With a three level reduction for acceptance of responsibility pursuant to USSG

---

[1]  The plea was tendered without a plea agreement.
[2]  Dinovo has been charged separately.   That case is pending.   *See United States v. Russell Dinovo* (#15-CR-100326-RGS).

§3E1.1, U.S. Probation has calculated Pantone's total offense level ("TOL") to be 22.   *See* PSR ¶¶

26-36.   Based upon a TOL of 22 and a CHC of VI, per the initial and final PSR, the advisory

guideline sentencing range is 84-105 months. *See* PSR ¶ 123.   The statutory maximum term of

imprisonment is 25 years.   *See* PSR ¶ 122.

The government submitted objections to the PSR including objecting to U.S. Probation

applying the three level increase under USSG §2B3.1(b)(2)(E) rather than a four level increase

under USSG §2B3.1(b)(2)(D).   The government maintains the airsoft fake air-gun was

"otherwise used" by Pantone rather than "brandished" or "possessed" by Pantone during the

commission of the bank robbery.[3]   As such, as outlined in its objections to the PSR, the

government asserts that a TOL of 23 and a CHC of VI would yield an advisory guidelines

sentencing range of 92-115 months.   This afternoon, U.S. Probation issued its final PSR and their

offense level calculations remain unchanged.   Additionally, in both its initial PSR and final PSR,

U.S. Probation computed Pantone's criminal history category ("CHC") to be a VI. [4]

A guidelines sentence is warranted in this case.   There is no basis for a variance or

downward departure.   The government recommends that the court impose a 92 month sentence in

this matter, followed by five years of supervised release, a $100 special assessment, and forfeiture.

The government asserts that this sentence is warranted here for several reasons:   the nature and

circumstances of this serious offense; the characteristics of Pantone, which include a criminal

record dating back forty-one years consisting of multiple convictions for crimes of violence as

well as other crimes; the real danger posed to the community by individuals who rob banks with

guns or with what appear to be real guns and the need to protect the public; as well as specific and

---

[3] The government's argument for a four level increase under USSG §2B3.1(b)(2)(D) is included later herein.
[4] In the initial PSR, U.S. Probation determined the defendant had a total of 21 criminal history points.   In the final
PSR, U.S. Probation concluded the defendant had a total of 20 criminal history points.   Regardless, both result in a
CHC of VI. *See* PSR ¶¶ 69, 74 of initial and final PSR.

general deterrence.   This memorandum will focus on the particular facts of this case, the specifics of Pantone's criminal history and convictions for crimes of violence and his characteristics, as well as specific and general deterrence, in support of the government's request for a significant period of incarceration and particularized supervised release conditions that will hopefully increase the likelihood that the defendant will not re-offend.

**III.     UNDER USSG §2B3.1(b)(2)(D) A FOUR LEVEL INCREASE IN OFFENSE LEVEL IS WARRANTED**

The government argues that a four level increase to the TOL under USSG § 2B3.1(b)(2)(D), rather than a three level increase under USSG § 2B3.1(b)(2)(E), is applicable in this case as the evidence demonstrated the airsoft fake air-gun was "otherwise used," rather than "brandished" or "possessed" during the commission of the bank robbery.

As outlined in its objections to the PSR, per USSG § 1B1.1 cmt. n.1(C), a dangerous weapon or firearm is "brandished" when all or part of the weapon was displayed or the presence of the weapon was otherwise made known to another person in order to intimidate that person, regardless of whether the weapon was directly visible to that person. The First Circuit has interpreted this definition to mean a general display of weaponry or a general threat, such as generally pointing or waving a weapon. *See United States v. Villar*, 586 F.3d 76, 89-90 (1st Cir. 2009); *United States v. LaFortune*, 192 F. 3d 157, 161 (1st Cir. 1999).

In contrast, per USSG § 1B1.1 cmt. n. 1(I), a dangerous weapon or firearm is "otherwise used" when the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.   The First Circuit has interpreted this definition to mean an unmistakably clear and specific threat of harm, such as specifically leveling a cocked firearm or dangerous weapon at an individual or a group of people.

*See Villar*, 586 F.3d at 89-90; *LaFortune*, 192 F. 3d at 161.    Thus, the distinction between "brandishing" and "otherwise used" depends on the level of specificity to which the weapon was used. *See Villar*, 586 F.3d at 89-90; *LaFortune*, 192 F. 3d at 161.    Other circuits have followed the First Circuit in this interpretation. See *United States v. Johnson*, 456 Fed.Appx. 540 (6th Cir. 2012) (finding that a defendant who held a toy gun, directed people to get on the ground, and told one victim he would "pop" him, had made a specific threat and thus "otherwise used" a dangerous weapon); *United States v. Orr*, 312 F.3d 141, 144-45 (3rd Cir. 2002)(finding that a defendant who pointed a dismantled pellet gun at a bank employee and ordered her to dump money into a garbage can made a specific threat and thus "otherwise used" a dangerous weapon).

In *United States v. Albritton*, 622 F.3d 1104, 1106-07 (9th Cir. 2010), the Ninth Circuit found that a defendant who pointed a BB gun directly a teller across the counter and yelled "Down, Down!" had "otherwise used" the weapon. The court, relying on First Circuit holdings, implicitly reasoned that directly pointing a weapon across the counter constituted an unmistakably clear and specific threat. *See id.* at 1106.

Here, the government argues the fake gun was likewise used by defendant Pantone to make an unmistakably clear and specific threat rather than a general display of weaponry or general threat.   *See Villar*, 586 F.3d at 89-90; *LaFortune*, 192 F.3d at 161.   The defendant remained in front of the counter with the gun out throughout the entirety of the robbery and gave orders to Dinovo.   The tellers saw the weapon and believed it was a real gun.   The defendant told the tellers not to look at them and repeated the command each time on of the teller's lifted his or her head.   Before the two robbers fled the bank, one said to the tellers "[y]ou need to get down" and one employee started to kneel down. The facts of this case support this four level enhancement to the offense level calculation.

**IV.**          **18 USC § 3553(a) FACTORS**

1. **Nature of the Offense**

The government argues that in calculating the sentence, the Court should consider the seriousness of the offense. *See* 18 U.S.C. §3553(a)(requiring assessment of the nature and circumstances of a defendant's offense(s)).   The offense of conviction for Armed Bank Robbery is significant in its seriousness.   The circumstances of this offense can be summarized as follows: The armed robbery occurred on Friday, October 9, 2015, at approximately 3:08 pm at the Hingham Institute for Savings Bank located at 80 Charles Street in Boston.   On that date, Pantone and Dinovo entered the bank with their faces partly covered, wearing hooded sweatshirts but portions of their faces were visible.   There were two bank employees working in the bank at that time. After entering the bank, Dinovo vaulted the teller counter, while Pantone stayed in front of the counter in the lobby area near the entrance holding what appeared to be a handgun in the air which was seen by the bank employees.   Pantone remained in front of the teller counter with the gun out throughout the entirety of the robbery.   The tellers believed it was a real gun.   Dinovo jumped over the teller counter and demanded money from the bank employees.   Dinovo forced open a teller's cash drawer, grabbed money out of it then proceeded to the vault where he demanded one bank employee open the vault.   After doing so, Dinovo removed money from the vault and placed the money in a dark colored duffel bag.   *See* PSR ¶¶ 7-8.

During the robbery, Pantone repeatedly told Dinovo to "[h]urry up, let's go" and to "[g]et the drawer."   At one point, Pantone told Dinovo, "[t]ime's up, we gotta go." Pantone appeared to be keeping time throughout the robbery. Pantone also told the tellers not to look at them and repeated the command each time one of the teller's lifted his or her head.   *See* PSR ¶ 9.

After stealing the money from a teller's cash drawer and from the vault, Dinovo left the

teller area and he and Pantone left the bank together.   Before they fled, one robber said "I know you pushed the alarm" while the other said "[y]ou need to get down."   An employee started to kneel down.   Pantone and Dinovo then fled out of the bank on foot, with $16,320.95 in United States currency, which they had stolen from the bank.[5]   *See* PSR ¶¶ 9-10, 12.

Upon exiting the bank, both men turned right on Charles Street.   A witness observed Dinovo and Pantone exit the bank and get into a Chevy Impala which remained parked and did not move. The same witness then saw both Dinovo and Pantone get out of that car and both got into a cab.   A witness provided the medallion number of the cab to police who located and stopped the cab approximately 30 minutes later near an intersection in Charlestown.   Pantone and Dinovo were sitting in the back seat of the cab at the time.   Also inside the cab, officers located a duffel bag containing $16,320.95, including bait bills that were maintained by the bank at the time of the robbery, and an item that looked like a handgun, as well as Dinovo's car keys.[6]   Police asked the cab driver whether the black back located in the back seat of the cab was his and he said it was the white males' and that one of the two men had the bag with him when the two men got into his cab.[7]   *See* PSR ¶¶ 11-13.

Investigators assembled two separate live line-ups on the sidewalk that same day.   One of the two bank tellers viewed the line-up containing Pantone and identified him as the individual who held that item that appeared to be a handgun in the lobby area.   The other bank teller viewed the line-up containing Dinovo and identified Dinovo as the individual who jumped the counter and took the money from the bank.   The FBI later determined the gun Pantone used during the robbery

---

[5] The deposits of the Hingham Institute for Savings are insured by the Federal Deposit Insurance Corporation ("FDIC").

[6] All of the money has been recovered.

[7] Both Pantone and Dinovo are Caucasian males.

was an imitation gun, specifically, an airsoft fake gun.[8]   *See* PSR ¶¶ 14-15.

Over the course of nine days Pantone and Dinovo robbed two Boston banks.   Previously, on September 30, 2015, Pantone and Dinovo were also involved in an uncharged bank robbery of a different Hingham Institute for Savings in Boston.   In that case, both men wore hooded sweatshirts with the hoods up and cinched tightly around their places, and while Pantone stayed in front of the counter in the lobby area pointing an airsoft fake gun at the two tellers during the entirety of the robbery, Dinovo stole $26,919.00 from the teller drawers and the vault.[9]   *See* PSR ¶¶ 17-21.   As evident by Pantone's actions in this case and by his prior criminal history, including prior convictions for armed bank robbery, this was not an aberrant one-time decision by Pantone to rob a bank using a fake firearm.   He committed a violent offense against victims when he robbed the bank.   His repeated conduct is both serious in its nature and in its impact on the community. A significant period of incarceration is justified.

### 2.   **The defendant's criminal history**

While the seriousness of the offense is a significant factor the government has considered in fashioning its recommendation, Pantone's criminal history is of equal import.   Pantone is currently 56 years old with a criminal record spanning more than four decades.   The final PSR determined that Pantone earned a total of 20 criminal history points which results in a criminal history category of VI.   *See* PSR at ¶ 74.   However, this computation does not tell the entire story.   Anthony Pantone's criminal record dates back forty-one years.   Pantone has 120 entries on his board of probation record.   He has repeatedly violated his terms of probation.

His criminal record dates back to 1975 when Pantone was only 15 years old and was

---

[8] Simulated weapons qualify as dangerous weapons under 18 U.S.C. § 2113(d).   *See United States v. Cannon*, 903 F.2d 849, 854 (1st Cir. 1990)(holding that evidence of toy gun can support an armed robbery conviction.)
[9] That money has not been recovered.

convicted of Armed Robbery (2 counts) for the first time.   He has a significant number of convictions for crimes of violence, specifically, Armed Robbery (multiple convictions), Assault and Battery with a Dangerous Weapon (multiple convictions), Assault and Battery (multiple convictions), Assault with a Dangerous Weapon (multiple convictions), Assault with Intent to Rob, and Assault and Battery on a Police Officer (multiple convictions).   Additionally, other convictions of his include, but are not limited to, Breaking and Entering Misdemeanor, Breaking and Entering with Intent to Commit a Felony (multiple convictions), Receipt of Stolen Property, Larceny of Motor Vehicle, Leaving the Scene of Property Damage, Malicious Destruction of Property, Possession of Burglarious Tools, Possession of Hypodermic Needle, Possession of Class C Drug (Klonopin), Possession of Class A, Possession of Class B (multiple convictions), and Resisting Arrest (multiple convictions).   Prior to this case, Pantone's most recent convictions were in 2011 for Assault Dangerous Weapon, Breaking and Entering Daytime Felony, Breaking and Entering Daytime Felony, person in Fear, Larceny over $250, and Threats to Commit a Crime. *See* PSR at ¶¶ 39-94.   He received a 3-5 year committed state prison sentence for the first four counts and a 6 month committed house of correction sentence for the Threats conviction to be served concurrent with the Assault Dangerous Weapon conviction. In that case, he was released from custody on June 26, 2015, a mere three and a half months before he committed the instant offense.   *See* PSR at ¶73.   Pantone has demonstrated a repeated and continued decades-long crime spree of committing serious and violent offenses.

### 3.     Specific and General Deterrence

The Court should also consider specific and general deterrence in this case.   See 18 U.S.C. § 3553(a)(2)(B),(C)(the district court may impose a sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant).   Here, Pantone

has been involved with the state judicial system for more than 41 years, with the longest sentence to date a three-to-five year committed sentence in 2011.   A little over three months after he was most recently released from a prison sentence, Pantone committed the armed bank robbery in the instant case.   In his interview with U.S. Probation in preparation for the PSR, even Pantone remarked that he is "in shock" that he is in jail after just getting released from custody.   *See* PSR at ¶112.   Clearly, deterrence is a factor to be considered in this case.

The government is recommending a guidelines sentence of 92 months and argues it is an appropriate significant sentence which will communicate to the defendant that he must stop committing crimes.   Equally important, such a sentence will tell similarly situated individuals who have committed a litany of state court crimes, that if they too continue their criminal conduct and are convicted in federal court, they too will face stiff sentences.

## V.    CONDITIONS OF SUPERVISED RELEASE

The government recommends a five year period of supervised release in this case.   This will allow U.S Probation to closely monitor Pantone for a lengthy period of time after he completes his committed sentence to assist with Pantone's re-integration into society.   Further, the government asks the Court to consider as special conditions of Pantone's supervised release mental health treatment, substance abuse treatment, and for Pantone to seek and maintain employment throughout the pendency of his supervised release.   *See* PSR at ¶¶ 110, 111, 113. The government argues this is appropriate.   In the PSR, the defendant reports suffering from a variety of mental health conditions since 2009.   *See* PSR at ¶ 110.   Additionally, Pantone has a history of chronic substance abuse and reports a history of drug abuse that includes alcohol, heroin, crystal meth, angel dust, acid, speed, Quaaludes, prescription medication, powder cocaine, and crack cocaine.   He first consumed alcohol when he was ten years old.   He reported that on the

day of his arrest in this case, he was abusing alcohol, powder and crack cocaine, and heroin.   *See* PSR at ¶ 113.   Although Pantone stated he wasn't abusing "street drugs" from July 2015 to September 2015, he was addicted to suboxone and was abusing his prescription of Xanax.   When he is not abusing substances, he suffers from withdrawal symptoms, which results in him abusing substances.   *See* PSR at ¶ 113.   His brother and sister described Pantone's abuse of substances as out of control, that he has been abusing substances since a very young age, and that he has never been able to overcome his addiction.   *See* PSR at ¶ 114.   The PSR reports that it appears Pantone is an appropriate candidate for the Bureau of Prison's ("BOP") 500 hour Residential Drug Abuse Program (RDAP) although it indicates final determination of qualification for that program is made by BOP.   Additionally, Pantone has expressed an interest in participation in the BOP's 500-hour residential drug abuse program. *See* PSR at ¶ 115.

## VI.     <u>CONCLUSION</u>

In light of the foregoing, the government recommends the imposition of 92 months

incarceration, followed by five years of supervised release with the special conditions of

supervised release recommended herein, a $100 special assessment and forfeiture.   The

government argues that the proposed sentence properly takes into account and balances the various

§3553 factors, as discussed above and that it is a sufficient, but not greater than necessary, sentence

that complies with the dictates of that provision.   This sentence is an appropriate one that the

government urges this Court to adopt.

<div style="margin-left: 40%;">

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

</div>

By:     <u>s/ Suzanne Sullivan Jacobus</u>
        Suzanne Sullivan Jacobus
        Assistant U.S. Attorney

Dated:   July 25, 2016


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing (NEF).


<u>s/ Suzanne Sullivan Jacobus</u>
Suzanne Sullivan Jacobus
Assistant U.S. Attorney