UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA    )
    )
v.    )        Cr. No. 1:16-CR-10018-IT
    )
ANTHONY PANTONE    )        **FILED UNDER SEAL**
    Defendant.    )
    )
_____

**ANTHONY PANTONE'S MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

Anthony Pantone, defendant in the above-captioned matter, respectfully

moves this Honorable Court for compassionate release under 18 U.S.C. §

3582(c)(1)(A) and the CARES Act of 2020 due to the "extraordinary and compelling

reasons" arising from the COVID-19 pandemic. As grounds, Mr. Pantone states:

1. Mr. Pantone is currently serving his sentence at USP-Canaan, with a release
   date of September 22, 2021.

2. At present, there are six positive cases of COVID-19 among inmates and one
   positive staff member at USP-Canaan, with one inmates and four staff
   recovered from previous infections[1]. Given the nature of his incarceration,
   Mr. Pantone is unable to engage in any effective form of social distancing or
   self-protection as recommended by the CDC, putting him at risk if the
   disease gains a further foothold among the inmate population.

3. Mr. Pantone is a 60-year-old man who suffers from █████████ *Exhibit A:*
   *BOP Medical Records of Defendant.*

_____

[1] As of October 27th. https://www.bop.gov/coronavirus/

1

4. Mr. Pantone is not a danger to the community. Though he pled guilty to an armed bank robbery, the weapon in question was a replica Airsoft pistol. The public safety will not be threatened, nor will respect for the law and general deterrence be undermined by converting the remainder of his sentence to home confinement.

5. If this motion is granted, Mr. Pantone plans to reside with his brother, Joseph Pantone. Joseph Pantone owns a house in Malden, where Anthony can have a room and be confined safely there until either the end of his original term of imprisonment, or until he is able to be placed in a halfway house. Mr. Pantone's brother does not have a criminal record, and is retired from the MBTA, but working part-time. Anthony Pantone will be able to quarantine at his brother's, to protect others from becoming infected, and will remain there until the completion of his term. Mr. Pantone's sister also lives nearby. Joseph Pantone said that he would be able to assist his brother in going to medical appointments or substance use counseling, as needed. Given Anthony Pantone's health concerns, he has no incentive to engage in behavior that would jeopardize a compassionate release. Probation agrees that this location is suitable for release.

## PROCEDURAL HISTORY

On October 9, 2015, Mr. Pantone was arrested by local authorities following a bank robbery. On December 10th, he was charged federally with one count of armed bank robbery. He pled guilty to that charge on May 10th, 2016 and was sentenced

to 78 months in custody with five years' supervised release. According to the BOP,

his release date is currently August 26, 2021.

## INTRODUCTION

The novel coronavirus known as COVID-19 has been killing older people with

pre-existing medical conditions like Mr. Pantone at a disproportionate rate. As of

October 15, 2020, the new strain of coronavirus, which causes COVID-19, has

infected 43.5 million people, leading to at least 1.16 million deaths worldwide.[2] The

number of people affected by this deadly illness increases each day.

The spread of the virus has been particularly acute within the prison

population. The Marshall Project, on October 22, 2020, identified that 152,955

people in prison had tested positive for COVID-19, a 4% increase from the week

before.[3] Indeed, the rate of infected inmates per 1,000 inmates is more than six

times greater than the rate of infected individuals in the U.S. population per 1,000

people, as reflected in the chart below:

---

[2] Center for Systems Science and Engineering at Johns Hopkins University,
"Coronavirus COVID-19 Global Cases Dashboard" (last accessed October 27, 2020),
https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd4
0299423467b48e9ecf6.
[3] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-
coronavirus-in-
prisons?utm_medium=email&utm_campaign=newsletter&utm_source=opening-
statement&utm_term=newsletter-20201023-2198#prisoner-cases



Available at <https://federaldefendersny.org/>.

This unparalleled health crisis in our country and in our prisons present "extraordinary and compelling reasons" to grant this motion. According to the BOP, USP-Canaan has already had multiple staff infected with the disease. As of October 27th, there are six active infections among inmates, one infected staff, one recovered inmate and four recovered staff. [4] The facility is due credit for its success in keeping the pandemic relatively under control thus far, but the overall BOP experience with CV19 demonstrate how rapidly the disease can spread once it has established a beachhead. The conditions in the facility make it impossible for Mr. Pantone to take measures to protect himself and avoid becoming infected, should the disease be introduced into USP-Canaan. "Social distancing" is not an option for Mr. Pantone or most other inmates. Indeed jails are a much more dangerous place to be than even a cruise ship.[5]

---

[4] *See* https://www.bop.gov/coronavirus/
[5] *See "An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction*

Whatever risk Mr. Pantone might pose to the community, it is far outweighed by the risk that Covid-19 poses to him, particularly in a prison setting. He pled guilty, without an agreement, to a count of armed bank robbery which involved a replica firearm and in which no bank employees were injured.  If this motion is granted, Mr. Pantone plans to reside with his brother, Joseph Pantone, at Joseph's home in Malden. U.S. Probation has reviewed and approved the proposed location. He can continue to be confined safely there until the end of his original term of imprisonment or, if the option is available, would relocate to a halfway house once a bed becomes available for him. Upon release, however, Pantone will be able to quarantine at his brother's house, where he would have a room and would have his medical and substance use treatment needs met. Given his health concerns, he has no incentive to engage in behavior that would jeopardize an early release on compassionate grounds.

The humane and compassionate thing to do is to convert Mr. Pantone's sentence to home confinement for its remainder. Considering his current age, his medical condition, and his placement at a facility with conditions ripe for the spread of disease, if he should become infected with the virus, his chances of survival would be unacceptably low.

---

*Continues*," The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

**ARGUMENT**

**I.   THIS COURT HAS AUTHORITY TO RESENTENCE MR. PANTONE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) GIVEN THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC AND THE PRISON CONDITIONS WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT**

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons." Importantly, the reasons that can justify resentencing need not involve only terminal illness or urgent dependent care for minor children.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. *Id.* Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c). But the legislative history to the statute gives an indication of how Congress thought the statute should be employed by the federal courts. The Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added).

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission").*See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The Commission took considerable time to promulgate its policy in response to Congress's directive. It finally acted in 2007, almost a generation later, with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n. 1(A). Yet this guidance did little to spur the BOP to file on behalf of prisoners who might have met these general standards.

After a negative DOJ Inspector General report found that the BOP rarely invoked its authority under the statute to move for reduced sentences, the Commission felt compelled to act again. *See* U.S. DOJ, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program,* I-2023-006 (Apr. 2013). The Commission amended its policy statement on "compassionate release" in November 2016. *See* U.S.S.G. § 1B1.13 Amend. (11/1/2016). In addition

to broadening the eligibility guidelines for sentencing courts, the new policy statement admonished the BOP for its past failures to file motions on behalf of inmates who had met the general criteria identified in U.S.S.G. § 1B1.13. *See* U.S.S.G. § 1B1.13, n.4; *see also United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the history of the BOP, DOJ and Commission's interplay in developing guidance for "compassionate release" motions). Notably, the Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing. *Id.,* n.1(A) (including a category for "Other Reasons," when there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).").

The Commission's actions, however, did little to change the dearth of filings by the BOP on behalf of inmates who satisfied the Commission's general guidance. During the more than three decades during which the BOP was the exclusive gatekeeper for "compassionate release" motions, very little effort was made to implement Congress's intention to provide a safety valve to correct injustices or allow relief under extraordinary and compelling circumstances.

This finally changed with the passage of the First Step Act in 2018. *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and move for release, a court can now resentence "upon motion of the defendant,"

after the inmate has exhausted administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C. § 3582(c)(1)(A).

Courts are now authorized to consider a defendant's motion, even one which the BOP opposes, and order resentencing if the Court finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the § 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A). Resentencing courts are also advised that any decision to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.*

The risk of death to an inmate with preexisting conditions as a result of the COVID-19 pandemic constitutes "extraordinary and compelling reasons" to grant compassionate release. *See Wise v. United States*, No. CR ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020) ("[J]ust last week, the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release."); *United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) ("The Government now agrees, based on recent Department of Justice guidance, that Wright's diabetes condition, and perhaps other medical conditions she presently has, could constitute "extraordinary and compelling reasons" under the circumstances of the COVID-19 pandemic."); *United States v. Atkinson*, 2020 WL 1904585, at *3 (D. Nev. Apr. 17, 2020) ("The presence of COVID-

19 . . . necessitates a more expansive interpretation of what self-care means" to include Covid-vulnerability coupled with the inability to practice CDC-recommended procedures to safeguard against transmission); *United States. v. Esparza*, 2020 WL 1696084 (D. Idaho Apr. 7, 2020) (same); *see also* Government's Response in Opposition to Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), *United States v. Hird*, Case No. 2:13-cr-39-TJS, Dkt. No. 650 (E.D. Pa. May 19, 2020) (government concession that "the risk of COVID-19" to a vulnerable inmate "presents 'a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility"");

In the District of Massachusetts, the Court has granted or partially granted requests for modifications of sentences for multiple inmates since the onset of the COVID-19 pandemic. *See e.g., United States v. Rovisnki,* 1:15CR10153-2-WGY (amending 15 year sentence in terrorism conviction to time served and imposing life term of supervised release, with 10 years to be served in home confinement, reviewable after six months, in light of defendants physical and mental health conditions); *United States v. Guzman-Soto*, No. 1:18-cr-10086-IT, 2020 WL 2104787, at *2, 4 (D. Mass. May 1, 2020) (finding hypertension to be a "condition that substantially diminishe[d] [the defendants]'s ability to provide self-care in the prison environment" and granting compassionate release) ; *United States v. Hager,* 13-10335-RWZ (D.Mass, August 12, 2020)(granting compassionate release to a 73 year old man with diabetes.) *United States v. Macfarlane*, No. 1:19-cr-10131-NMG,

Dkt. No. 352 (D. Mass. Apr. 14, 2020) (Gorton, J.) (holding that the COVID-19 pandemic, the risk it imposes to sentenced inmates, the defendant's status as a non-violent first time offender, and other factors constitute "extraordinary and compelling circumstances which warrant a reduction in [the defendant's] sentence"); *United States v. Capelton*, No. 3:00-cr-30027-MGM, Dkt. No. 539 (D. Mass. April 10, 2020) (granting compassionate release "in light of Defendant's short remaining time before his release, his age, and the conditions at MDC-Brooklyn" and modifying sentence to time served and home confinement with revised conditions of supervised release); *United States v. Sanderson*, No. 1:14-cr-10168-FDS, Dkt. No. 215 (D. Mass. April 6, 2020) (granting compassionate release, with assent of government).

Other Districts have issued similar orders granting compassionate release in response to COVID-19, particularly in cases where inmates suffered from comparable medical conditions as Mr. Pantone, or were in the higher-risk age bracket. See e.g. *United States v. McGraw*, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (granting compassionate release to 72 year-old inmate with limited mobility, ███████████████████████ and other issues); *United States v. Gray*, 416 F. Supp. 3d 784, 786 (S.D. Ind. Sept. 20, 2019) (granting compassionate release to a defendant with "chronic debilitating medical conditions" including ███ ████████████████████████████████████████████████████); *United States v. Saad*, No. 16-20197, 2020 WL 2251808, at *5 (E.D. Mich. May 5, 2020) (defendant was 71 years old and suffering from ███████████████ ████████████████████████████ and ██████); *United States v.*

*Spencer Harris*, No. 06-CR-30058, 2020 WL 3483559, at *3 (C.D. Ill. June 26, 2020)("Mr. Harris has been diagnosed with ███████████ and ████ ████, as well as █████ and ███████.")*; United States v. Regas,* No. 391CR00057MMDNA1, 2020 WL 2926457, at *3 (D. Nev. June 3, 2020)(granting compassionate release for 77 year old at facility with no confirmed COVID-19 cases)*; United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *4 (E.D. Mich. June 10, 2020)("Moreover, it is beyond dispute that the defendant's age places him at serious risk according to the CDC guidelines, and his risk is aggravated by other serious conditions including a history of ████████, essential ███████████; ██████, and ██████ from which he evidently suffers daily and for which he takes medication.").[6]

Since Mr. Pantone is particularly susceptible to dying from COVID-19 due to his age, preexisting medical condition, and the conditions of his confinement, this Court should exercise its discretion to resentence Mr. Pantone to home confinement for the duration of his sentence.

---

[6] For further decisions concerning ███████████ and Age, see *United States v. Copeland*, No. 1:03-cr-01120-FB-1, 2020 WL 2537250 (E.D. N.Y. May 19, 2020); *United States v. Cotinola*, No. 1:13-cr-03890-MV-1, 2020 WL 2526717 (D. N.M. May 18, 2020); *United States v. McGraw*, 2:02-cr-00018-LJM-CMM, 2019 WL 2059488 (S.D. Ind. May 9, 2019); *United States v. Etzel*, No. 6:17-CR-00001-AA, 2020 WL 2096423 (D. Or. May 1, 2020); *United States v. Hammond*, No. 1:02-cr-00294-BAH-1, 2020 WL 1891980 (D. D.C. Apr. 16, 2020); *United States v. Miller*, No. 2:16-cr-20222-AJT-RSW-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020).

## II.   MR. PANTONE IS PARTICULARLY SUSCEPTIBLE TO CONTRACTING AND DYING FROM COVID-19 DUE TO HIS AGE AND PREEXISTING MEDICAL CONDITION, AND THE CONDITIONS OF INCARCERATION WHICH FOSTER THE SPREAD OF COVID-19

Mr. Pantone is particularly susceptible to contracting COVID-19 due to the conditions of his confinement, which make social distancing impossible and have proven amply over the past six months to facilitate and accelerate the spread of the virus. He is particularly vulnerable to dying from COVID-19 due to his age and preexisting liver condition which put him in a high-risk category.

The CDC advises that anyone 65 or older is at a higher risk for severe illness and death from COVID-19.[7] Mr. Pantone is very close to that age and his medical condition amplifies that risk. Specifically, Mr. Pantone suffers from ████████ *See Medical Records*, attached as Exhibit A.

 weakens a person's immune system.[8] The ████████ "basically dulls the normal immune response to viral infection. Without a strong signal our body's cells cannot then mount an effective inflammatory and anti-viral response that clears infection."[9] The CDC currently advises that ████████ such a ████████ may make a person more likely to become severely ill with

---

[7] *See* CDC, *Groups at Higher Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higherrisk.html; CDC, *Weekly Updates by Select Demographic and Geographic Characteristics*, available at < https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm>
[8] *See* Trinity Coll. Dublin, How ████████ 'Ghosts' Our Immune System, Science Daily (June 5, 2019), https://www.sciencedaily.com/releases/2019/06/190605105940.htm.
[9] Id.

COVID-19 if the ███████ is not well-controlled.[10] One court granted

compassionate release to a person with chronic ███████ noting that even if

cured, "it is not at all clear one's immune system simply rebounds from a long-term

███████ infection." *United States v. Stephenson*, No. 3:05-CR-00511, 2020 WL

2566760, at *6 (S.D. Iowa May 21, 2020) (citing Benedikt Strunz et al., Chronic

███████ Irreversibly Impacts Human Natural Killer Cell

Repertoire, 9 Nature Comm. 2275 (2018)).[11]

Making matters more dire, conditions of confinement at USP-Canaan create

an optimal environment for the transmission of contagious disease. Public health

experts are unanimous in their opinion that incarcerated individuals "are at special

risk of infection, given their living situations" which makes them "less able to

participate in proactive measures to keep themselves safe."[12] In short, "infection

control is challenging in these settings." *Id.*

Further, social distancing of 6 feet as recommended by the CDC and public

health officials is impossible. Not only are there roughly 350 inmates per unit, but

---

[10] CDC, *What to Know About* ███████ *and COVID-19*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/███████
(May 5, 2020).
[11] https://www.nature.com/articles/s41467-018-04685-9. See also *Immune System
Does Not Recover Despite Cured* ███████ *Infection*,
Karolinska Inst. (June 11, 2018), https://news.ki.se/immune-system-does-not-
recoverdespite-
cured-███
[12] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-
President Mike Pence, and Other Federal, State, and Local Leaders from Public
Health and Legal Experts in the United States" (March 2, 2020), available at
<https://bit.ly/2W9V6oS>.

the cells are shared by 12 inmates. If one inmate or staff member on a unit contracts COVID-19, it is practically inevitable that all the inmates on that unit will contract it as well.

Two jails in Ohio provide a cautionary illustration in the difficulties faced by even earnest efforts to control and contain the disease in a carceral setting. As of October 26, 2020, Marion Correctional Institution reported 1,940 inmate COVID-19 cases, and the Pickaway Correctional Institution reported 1,380 inmate COVID-19 cases.[13] Twelve inmates have died at Marion and at least 35 have died at Pickaway; one staff member also has died at each facility.[14] The Ohio corrections department originally planned to move infected inmates from Marion to a separate facility and "decided to test everyone" at the prison, the idea being "to find the people who were positive and asymptomatic and move them[.]" According to the director of the department, "When we got the results back from Marion, there were so many people who were asymptomatic and positive, we knew that everyone who lived in that prison had had exposure and the separation wasn't going to work"[15]

Closer to home, The Donald W. Wyatt detention facility offers an illustration of how rapidly matters can spin out of control as a result of bad luck and inattention

---

[13] These numbers include inmates who are "currently positive" for COVID-19, inmates who have recovered from COVID-19, and inmates who have confirmed COVID-19 related deaths. *See* Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (Octo. 26, 2020), https://coronavirus.ohio.gov/static/reports/DRCCOVID-19Information.pdf
[14] Id.
[15] Marion Star, "Ohio Prison Planned to Isolate Sick Inmates. But Then 80% Tested Positive." (Apr. 30, 2020), https://www.marionstar.com/story/news/local/2020/04/30/marion-ohio-prison-planned-isolate-sick-inmates-80-tested-positive/3059217001/.

to detail. Wyatt has seen its reasonably successful efforts over the summer at containing the virus catastrophically erode in a matter of weeks. Coming into October, the facility had seen 63 cases among detainees and 31 cases among staff, cumulatively since the beginning of the pandemic, and reporting no active cases among inmates.[16] By October 15th, however, the facility was report 28 active inmate cases.[17] Five days later, The Providence Journal was reporting the inmate figure had increased to 52 active cases, with eight positive cases among staff.[18] Two days later, the number was up to 63 and 10, respectively, and Wyatt Warden Daniel W. Martin attributed the outbreak to a combination of introduction from outside sources and an a apparently lax policy toward mask and hygiene protocols within the facility.[19] As of Monday, October 26th, Wyatt reported to the U.S. Marshals that 130 inmates and 11 staff had recently tested positive at the facility; it has suspended inmate transfers to and from courts until at least November 6th. Put simply, Wyatt reported as many new inmate cases in October as it saw in the six-month period preceding it.

Mr. Pantone is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection. He

---

[16] https://www.rid.uscourts.gov/sites/rid/files/wyatt5.pdf

[17] https://www.rid.uscourts.gov/sites/rid/files/documents/Wyatt%20Report%201015.pdf

[18] https://www.providencejournal.com/story/news/local/2020/10/20/wyatt-detention-facility-sees-spike-coronavirus-cases/5991588002/

[19] https://www.providencejournal.com/story/news/courts/2020/10/22/u-s-district-court-judge-mary-mcelroy-questions-wyatt-prison-officials-coronavirus-outbreak-cases-sp/3726200001/

cannot self-quarantine or partake in "social distancing" in his prison facility. He is

housed in a high-density custodial situation which is precisely the kind of space

that has caused the alarmingly high-spread rates of COVID-19.[20] Hand sanitizer,

an effective disinfectant recommended by the CDC to reduce transmission rates, is

contraband in jails and prisons because of its alcohol content.[21] Correctional health

experts worry that no matter what precautions are taken by crowded prisons, these

facilities may become incubators for the COVID-19 disease.[22]

During the H1N1 epidemic in 2009, many jails and prisons dealt with high

numbers of cases because they could not maintain the level of separation and

sanitation necessary to prevent widespread infection.[23] The Prison Policy Initiative

has called on American jails and prisons to release medically fragile and older

adults, noting that these persons are at high risk for serious complications and even

death from COVID-19.[24] For these reasons, members of Congress have written to

[20] "White House Tells Travelers from New York to Isolate as City Cases Soar," *New York Times* (March 24, 2020), available at
<https://www.nytimes.com/2020/03/24/nyregion/coronavirus-newyork-update.html.>
[21] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?*," ABA Journal* (March 13, 2020), available at
<https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-containcoronavirus.>
[22] Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," *NPR* (March 13, 2020), available at
<https://www.npr.org/2020/03/13/815002735/prisons-and-jailsworry-about-becoming-coronavirus-incubators.>
[23] "Prisons and Jails are Vulnerable to COVID-19 Outbreaks," *The Verge* (Mar. 7, 2020), available at <https://bit.ly/2TNcNZY>
[24] Peter Wagner & Emily Widra, "No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform," *Prison Policy Initiative* (March 6, 2020), available at <https://www.prisonpolicy.org/blog/2020/03/06/pandemic>

the BOP to urge that efforts be made to allow immediate release of non-violent, elderly inmates.[25]

Notably, on April 3, 2020, Attorney General William Barr sent a directive to the Director of BOP entitled "*Increasing Use of Home Confinement at Institutions Most Affected by COVID-19.*" In his memorandum, Attorney General Barr directed BOP to identify suitable candidates for home confinement and "immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or … in the residence to which the inmate is being transferred."

In sum, the COVID-19 virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to persons having the high-risk age and medical condition that Mr. Pantone has. The conditions at USP-Canaan do not allow Mr. Pantone to take the full host of self-care measures required by the CDC to protect his safety.

## III.   THE RELEVANT § 3533(a) FACTORS FAVOR COMPASSIONATE RELEASE

When extraordinary and compelling reasons are established, the Court must then consider the relevant sentencing factors in § 3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). A review of the §

---

[25] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

3553(a) factors, and Mr. Pantone's release plan of home confinement for the remainder of his unserved original term of imprisonment, favor granting him compassionate release. The likelihood of death is excessive punishment considering the nature and circumstances of the offense. On the contrary, home confinement for the duration of his sentence is appropriate to adequately punish Mr. Pantone while alleviating his risk of death.

A consideration of Mr. Pantone's history and background support the proposition that the vast majority of Mr. Pantone's criminal history is directly related to substance use issues. ████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████. He would occasionally go to detox, and at times had short stays in a treatment program, but nothing stuck. When his drug use led to crime, he chose prison rather than treatment, because he wanted to quit on his own terms.

Although Mr. Pantone had several periods of sobriety, it always seemed like another obstacle was just waiting to reveal itself. For example, in the early 90's, Mr. Pantone was sober and successfully employed as a truck driver for the Teamsters. One day, while making a delivery, he fell from a loading dock, severely injuring his back. He was unable to work for several years and, regrettably, a doctor gave him

████ for the pain. It took a prison sentence 2012 for Pantone to get himself clean from ██████████████ .

Pantone remained drug free from 2012 until a few days prior to his arrest in this case, when he went on a three-day drug binge with a man who had also just been released from prison. Mr. Pantone has been sober for more than four years while in BOP custody. He is motivated to continue that sobriety. Despite his years of drug abuse, and repeated stints in prison, it is telling that his family has stood by him. At sentencing in this case, Pantone's friends and family submitted more than two dozen letters of support, attesting to the man they still think he can be. If released to home confinement at his brother's house, he will have no access to drugs. Mr. Pantone's brother has no criminal record and does not use any drugs. He will not tolerate any drug use on Mr. Pantone's part, and he is willing to assist Mr. Pantone with his sobriety in any way he can. U.S. Probation has assessed the proposed release plan and approved it.

Given Mr. Pantone's age and medical conditions, his risk of death from COVID-19 is greater than most inmates. To date, he has served 50 months in custody and his release is less than one year away. The purposes of punishment are better served by allowing him to serve the remainder of his sentence on home confinement, where his risk of death from COVID-19 is not unacceptably high.

Respectfully Submitted,
**ANTHONY PANTONE**
By his attorney:


/s/ Michael Tumposky
Michael Tumposky
BBO No. 660618
Hedges & Tumposky, LLP
50 Congress St, Suite 600
Boston, MA 02109
T (617) 722-8220


## CERTIFICATE OF SERVICE

I, Michael Tumposky, hereby certify that on this 28th day of October, 2020, I served one true and correct copy of this motion, through the electronic filing system, on all counsel of record in this matter.

/s/ Michael Tumposky
Michael Tumposky