UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO.  16-cr-10018-IT |
| v. | ) | |
| | ) | |
| ANTHONY PANTONE, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE FROM INCARCERATION
(LEAVE TO FILE GRANTED ON NOVEMBER 12, 2020)[1]

The United States of America hereby opposes Anthony Pantone's ("defendant") Motion for Compassionate Release ("Motion") and requests that it be denied.  ECF No. 51.  Defendant's Motion fails on multiple grounds. First, Defendant has failed to establish that, if released, he would not pose a danger to the community.  Second, although Defendant has identified a health issue, namely, ██████████ it does not, under the circumstances, constitute extraordinary and compelling reasons for erasing the remaining approximately 10 months of his sentence.  Third, the imposition of a time-served sentence is not appropriate under the factors set forth in 18 U.S.C. § 3553(a), as required by § 3582(c).  Given all the circumstances, releasing the Defendant back to the community does not meet the requirements of § 3582(c).

BACKGROUND

On January 21, 2016, a one-count Indictment charging the Defendant with Armed Bank Robbery, in violation of 18 U.S.C. §§ 2113(a),(d) and § 2, was returned.  On May 10, 2016, Pantone entered a guilty plea to the Armed Bank Robbery before this Honorable Court.  On August 1, 2016, this Court imposed a sentence of 78 months followed by 5 years of supervised release and

---

[1] An unredacted copy of the Government's Opposition will be filed under seal. ECF No. 57, 58.

Judgment issued on August 3, 2016.  ECF No. 45.  Per the Presentence Report ("PSR"), dated July 25, 2016, U.S. Probation calculated the Defendant's total offense level ("TOL" as follows:  a base offense level ("BOL") of 20 per USSG §2B3.1; an additional 2 level increase per USSG §2B3.1(b)(1), because the property of a financial institute was taken; and an additional three level increase per USSG §2B3.1(b)(2)(E), because a dangerous weapon was brandished or possessed. With a three-level reduction for acceptance of responsibility pursuant to USSG §3E1.1, U.S. Probation calculated Defendant's TOL to be 22.  *See* PSR ¶¶ 26-36.  With a TOL of 22 and a CHC of VI, the advisory guideline sentencing range is 84-105 months. *See* PSR ¶ 123.  The statutory maximum term of imprisonment is 25 years.  *See* PSR ¶ 122.  The government recommended a sentence of 92 months and Defendant recommended a sentence of 48 months.  ECF No. 39, 41.

Defendant is currently completing his term of imprisonment at Canaan USP in Waymart, Pennsylvania.  Canaan USP is a high security federal correctional institution with 1085 inmates. *See* www.bop.gov/locations/institutions/caa (last accessed November 12, 2020).  According to the Defendant's Bureau of Prisons ("BOP") sentry record, his projected release date is September 22, 2021, – roughly 10 months from now.  Per contact with BOP Supervisory Attorney Jonathan Kerr on November 4, 2020, Canaan USP has tested 343 inmates for COVID-19.   Per Attorney Kerr, the BOP COVID screening and testing procedures include the following:  staff are temperature and symptom screened daily prior to entering the facility.  Arrangements are also made to ensure that staff who display symptoms or have been identified during contract tracing have access to and are tested.  *Also, see* Federal Bureau of Prison Module 3, Screening and Testing, COVID-19 Pandemic Response Plan, September 28, 2020, version 1.0 attached as Exhibit A.  As of November 12, 2020, one inmate at Canaan USP and two staff members have currently tested positive for COVID-19 while 7 inmates and 4 staff members have recovered from COVID019.  *See*

https://www.bop.gov/coronavirus/ (last viewed November 12, 2020).  In his Motion, Defendant concedes that the facility (i.e., Canaan USP) "is due credit for its success in keeping the pandemic relatively under control thus far, but the overall BOP experience with [COIVD-19] demonstrate how rapidly the disease can spread once it has established beachhead."  *See* ECF No. 51 at p. 4. However, Defendant now seeks a compassionate release from his term of incarceration pursuant to 18 U.S.C. § 3582(c), in light of the present COVID-19 pandemic.  Defendant argues he has an underlying health concern that puts him at risk for COVID-19 while he is incarcerated.  He further argues that this condition, could result in severe illness or death if he is infected with COVID-19. Specifically, the Defendant, who is 60 years old and an otherwise healthy person, cites ███████

███ , as well as the COVID-19 pandemic, as the bases for his motion seeking early release.  ECF No. 51 at p. 1.  However, Defendant has not shown that he meets the criteria of compassionate relief that warrant a sentence reduction.  Accordingly, his Motion should be denied.

<u>APPLICABLE LEGAL FRAMEWORK</u>

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed, except under limited circumstances."  18 U.S.C. § 3582(c).  *See Dillon v. United States*, 560 U.S. 817, 824 (2010).  The statute, adopted as part of the Sentencing Reform Act of 1984, originally permitted judicial relief only upon a motion by the Director of BOP.  The provision was amended by Section 603(b) of the First Step Act, effective December 21, 2018.  Under the statute as amended, the court may consider a defendant's motion for compassionate release following the exhaustion of his or her administrative remedies with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner:

> The court <u>may not modify a term of imprisonment once it has been imposed</u>
> <u>except that</u>, . . . the court, upon motion of the defendant after the defendant has
> fully exhausted all administrative rights to appeal a failure of the Bureau of
> Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from

the receipt of such a request by the warden of the defendant's facility, whichever is earlier, <u>may reduce the term of imprisonment</u>…

18 U.S.C. § 3582(c)(1)(A) (emphasis added).  The First Step Act did not amend the eligibility requirements for compassionate release, which are set forth in 18 U.S.C. § 3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G.").  The court can only modify a sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction;" or that the defendant is at least 70 years old and has served at least 30 years in prison, among other things.  18 U.S.C. § 3582(c)(1)(A)(i) and (ii); *See also* U.S.S.G. § 1B1.13.  In either case, the proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission" and a determination has been made by the Director of BOP that the defendant "is not a danger to the safety to any other person or the community." 18 U.S.C. § 3582(c)(1)(A)(ii). These statements are contained in U.S.S.G. § 1B1.13 and mandate that a release should only occur if "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)…" *See* U.S.S.G. § 1B1.13(2).

As set forth above, 18 U.S.C. § 3582(c)(1)(A) requires that Defendant exhaust administrative remedies before bringing a motion under the statute.  On April 3, 2020, the Defendant submitted a request for compassionate release with the Warden of Canaan USP.  By letter dated April 7, 2020 and signed by Warden Eric Bradley, the Defendant was notified that his request for home confinement placement was denied.  *See* Exhibit B attached hereto.  In denying his request for early release, the Warden noted that BOP must take into consideration whether the inmate's release would pose a danger to the safety of any other person or the community and based on BOP's review of the Defendant's information, BOP believed that should he be released, it would pose a danger to the community.  *Id.*  As such, BOP denied Defendant's request for

compassionate release.  *Id.*  It is the government's understanding that the Defendant did not file an

administrative appeal of BOP's denial of his petition; but given that his original petition was filed

more than 30 days ago, the Defendant's motion is ripe for consideration before this Court.  18

U.S.C. § 3582(c)(1)(A).  *See also United States v. Alam*, 2020 WL 2845694, at *2-*5 (6th Cir. June

2, 2020).

The Application Notes to Section 1B1.13 describe the circumstances under which

"extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 Application Note 1. These

include an assessment of the defendant's medical condition, age, family circumstances, and other

reasons:

> (A) Medical Condition of the Defendant.—
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>> (ii) The defendant is—
>>> (I) suffering from a serious physical or medical condition,
>>> (II) suffering from a serious functional or cognitive impairment, or
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>> (ii)The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 Application Note 1.  These conditions qualify as extraordinary and compelling

reasons only when they "substantially diminish the ability of the defendant to provide self-care

within the environment of a correctional facility and from which he or she is not expected to recover." *Id.*

The policy statement is not the only source of criteria the court may apply in determining whether "extraordinary and compelling reasons" exist to justify a reduction.  Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  *Id.* at Application Note 1(D).  Accordingly, a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release.  That regulation appears at BOP Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  This program statement contains standards that are both more extensive than and slightly different from those stated in the § 1B1.13 policy statement.  The program statement defines a "debilitated medical condition" as follows:

> Debilitated Medical Condition. Reduction in Sentence ("RIS") consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover. The BOP should consider a RIS if the inmate is:
> - Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or
> - Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.
>
> The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function).  A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Program Statement 5050.50 at 5.  The program statements provisions regarding the class of inmates eligible for compassionate relief is also slightly different from the related provision in Section 1B1.13.  To the extent that the program statement and the policy statement conflict, it is

the policy statement – i.e., the source directly authorized by statute – that is binding.   An interpretation in the program statement that does not contradict the policy statement, however, is entitled to some weight.  *See Reno v. Koray*, 515 U.S. 50, 61 (1995) (BOP program statements, which do not require notice and comment, are entitled to "some deference" where they reflect a "permissible construction of the statute" (internal quotation marks omitted).

Defendant bears the burden of proving that he is entitled to relief under 18 U.S.C. § 3582.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

## ARGUMENT

Defendant has not established that he satisfies the requirements of the statute.  "[A] court may reduce a term of imprisonment under the compassionate release provision if it: (1) finds that extraordinary and compelling reasons warrant the reduction; (2) finds that the defendant will not be a danger to the safety of any other person or the community; and (3) the sentencing factors outlined in 18 U.S.C. § 3553(a) weigh in favor of reduction."  *United States v. Khawaja*, 2020 WL 1940848 at *2 (D.N.H. April 22, 2020).  "The defendant has the burden of showing that he or she is entitled to a sentence reduction."  *Id*.  "The court has 'broad discretion in deciding whether to grant or deny a motion for sentence reduction.'"  *Id*. (citation omitted).  *Also, see United States v. Miamen*, 2020 WL 1904490 at *2 (D.R.I. April 17, 2020).  Here, Defendant cannot satisfy the three prongs of the standard.

### I.    **Defendant Is Not Eligible For Release Because He Presents a Danger to The Community.**

Defendant has failed to satisfy the second requirement for release – that his release will not present a danger to the community.  Other than acknowledging that a replica Airsoft pistol was used by the Defendant during the course of the armed bank robbery, Defendant's motion fails to address the specific facts of this case and his prior criminal history, which demonstrate the threat that he would pose if released early.  In the afternoon hours of October 9, 2015, with their faces partly covered, Defendant and Russell Dinovo ("Dinovo") entered the Hingham Institute for Savings Bank ("bank") in Boston, and, with the Defendant holding an airsoft fake gun, the men robbed the FDIC-insured bank of $16,320.95, and ordered the bank tellers to the ground before fleeing.

On that date and time, the Defendant and Dinovo entered the bank with their faces partly covered, wearing hooded sweatshirts but portions of their faces were visible.[2]  There were two bank employees in the bank at that time.  After entering the bank, Dinovo vaulted the teller counter, while the Defendant stayed in front of the counter in the lobby area near the entrance holding what appeared to be a handgun in the air which was seen by the bank employees. Defendant remained in front of the teller counter with the gun out throughout the entirety of the robbery.  The tellers believed it was a real gun.  Dinovo jumped over the teller counter, demanded money from the bank employees, forced open a teller's cash drawer, grabbed money out of it then proceeded to the vault where he demanded one bank employee open the vault. After doing so, Dinovo removed money from the vault and placed the money in a dark colored duffel bag.  *See* PSR ¶¶ 7-8.  During the robbery, Defendant repeatedly told Dinovo to "[h]urry up, let's go" and to "[g]et the drawer."  At one point, Defendant told Dinovo, "[t]ime's up, we

---

[2] Dinovo was charged separately.  He pled guilty and on May 24, 2018, was sentenced to a term of 57 months followed by 5 years of supervised release.  *See* 15-cr-10326-RGS.

gotta go." Defendant also told the tellers not to look at them and repeated the command each time one of the teller's lifted his or her head. *See* PSR ¶ 9. After stealing the money from a teller's cash drawer and from the vault, Dinovo left the teller area and he and the Defendant left the bank together. Before they fled, one robber stated "I know you pushed the alarm" while the other said "[y]ou need to get down." An employee started to kneel down. Defendant and Dinovo then fled out of the bank on foot, with $16,320.95 in United States currency, which they had stolen from the bank. *See* PSR ¶¶ 9-10, 12.

A witness observed Dinovo and Defendant exit the bank and get into a car which remained parked and did not move. The same witness then saw both individuals get out of that car and both got into a cab. Police stopped the cab approximately 30 minutes later in Charlestown. Defendant and Dinovo were sitting in the back seat of the cab at the time. Inside the cab, officers located a duffel bag containing $16,320.95, including bait bills that were maintained by the bank at the time of the robbery, an item that looked like a handgun, and Dinovo's car keys. *See* PSR ¶¶ 11-13. The FBI later determined the gun the defendant used during the robbery was an imitation gun, specifically, an airsoft fake gun. *See* PSR ¶¶ 14-15.

The instant crime of conviction, which Defendant committed at age 56, is a serious one and is the culmination of a long criminal history dating back 45 years, to 1975. Although the Court is familiar with Defendant's criminal convictions as outlined in the PSR, certain points bear mention:

- 8/15/77, at age 17, Defendant received a 5 year probationary sentence for two convictions of Armed Robbery, and was found in violation of probation in that case; that same year he was charged separately with ABDW and received a 6 year committed sentence (PSR ¶¶39-40);
- 8/1/82, Defendant was convicted of Larceny of MV and received a 2 years sentence which was suspended (PSR ¶42);
- 1/19/90, at age 29, Defendant received a 6 month committed sentence with the balance suspended for 2 years after being convicted of Armed Robbery (PSR ¶44);

- 11/7/89, Defendant was convicted of Larceny of Property < $250, and received a one year sentence suspended for one year (PSR ¶45);
- In 1990, in four separate cases, Defendant was convicted of RSP, Attempt, ABDW, RSP, A&B and the longest period of incarceration he received a 6 month committed sentence (PSR ¶¶46-49);
- 12/17/92, Defendant received a 5 year sentence with 6 months to serve and the balance suspended for 3 years after being convicted of Assault with Intent to Rob (PSR ¶50);
- 7/21/95, at age 34, Defendant received Guilty filings in two separate cases after being convicted of Larceny MV, Leaving Scene Property Damage, Malicious Destruction of Property, Receipt of Stolen Property (in one case), and Attempt to Commit a Crime and Malicious Destruction of Property (in a second case) (PSR ¶¶51-52);
- In 1999, Defendant was convicted of a charge of Criminal Liability of Conduct of Another and Possession Hypodermic Needle and receive a 12 month suspended sentence on the first count and a 6 month suspended sentence on the second count (PSR ¶55);
- Between 2001 and 2010, Defendant was convicted of a variety of crimes including Larceny > $250, Possession Class C (Klonopin), Assault D/W (knife), ABPO, Possession Class A, Breaking and Entering, A&B, Possession Class B, Resisting Arrest, Possession Burglarious Tools Attempt, Credit Card Misuse, and Uttering, with the longest sentence served being 1 year committed (PSR ¶¶56-72); and
- On 12/22/11, at age 51, Defendant was convicted of Assault Dangerous Weapon, B&E Daytime for Felony, D&E Daytime for Felony Person In Fear and Larceny > $250 and received a 3-5 year committed sentence (PSR 73);

Defendant's criminal history also reflects he has been found in violation of the terms of his probation on multiple occasions in different cases. *See* PSR ¶¶39, 44, 53, 56, 5766, 67, 68, 69. In addition, while serving his current BOP sentence, the Defendant has been found guilty of three disciplinary infractions at Canaan USP. On April 19, 2017, BOP discovered four sharpened/pointed metal weapons under the floor of unsecured bottom locker (both occupants dispute ownership) and after a disciplinary hearing was held on April 25, 2017, defendant received a sanction for Possessing a Dangerous Weapon. *See* Exhibit C attached hereto. On February 18, 2020, Defendant allowed another inmate access to his (Defendant's) account to place a call, which the Defendant denied. A disciplinary hearing has held on February 28, 2020, and Defendant received a sanction for phone abuse/disrupt monitoring. *Id.* Most recently, on September 18, 2020, which was only a little more than one month prior to filing his motion for

compassionate release, Defendant engaged in a closed fist fight with another inmate in the

common area of the housing unit.  On October 5, 2020, a disciplinary hearing was held and

Defendant received a sanction for fighting with another inmate.  *Id.*

 In contrast to serious facts of this case and to his criminal history and his disciplinary

infractions while in BOP custody, in support of his motion for compassionate release, Defendant

argues that he "is not a danger to the community" and "[t]he public safety will not be threatened,

nor will respect for the law and general deterrence be undermined by converting the remainder of

his sentence to home confinement" ECF No. 51 at p. 2.  He also argues that "[g]iven his health

concerns, he has no incentive to engage in behavior that would jeopardize a compassionate

release."  *Id.*  He contends that "whatever risk Mr. Pantone might pose to the community, it is far

outweighed by the risk that COVID-19 poses to him, particularly in a prison setting".  *Id.* at p.5.

Defendant's proposed release plan is to reside with his brother in Malden.  *Id* at p. 2.  However,

per Massachusetts Department of Public Health, as of November 4, 2020, the average daily

incidence rate of COVID-19 in Malden is 16.5 out of 100,000 and there have been 181 positive

test results in the past fourteen days.  *See* https://www.mass.gov/doc/weekly-covid-19-public-

health-report-november-5-2020/download.  Further, the government contends Defendant remains

a danger to the community and is serving his current sentence after having been convicted of a

serious offense.  His record reflects a pattern of dangerous conduct, reflects the fact that this is

not his first robbery-related conviction and reflects his history of non-compliance with terms of

probation.

Courts have repeatedly denied compassionate releases based on COVID-19 grounds

because of the danger presented to the community.  *See, e.g., United States v. Butler*, 2020 WL

1689778 at *2 (S.D.N.Y April 7, 2020) (denying motion where the defendant's "conduct

"endangered not only the gang's intended target[s] but members of the public in the vicinity'"');

*United States v. Mata*, 2020 WL 1911225 at *2 (S.D.N.Y April 20, 2020) (motion denied due to

danger to the community); *United States v. Simmons*, 2020 WL 1847863 at *2 (S.D.N.Y April

13, 2020) (danger to the community is an "independent basis for the denial" of a compassionate

release motion); *United States v. Ebersol*, 2020 WL 1450745 at *2 (N.D.CA. March 25, 2020)

(danger to the community is an independent ground to deny release).

**II.**    **Defendant Does Not Present an Extraordinary and Compelling Reason for
Release**

Defendant's Motion has failed to set forth an extraordinary and compelling reason to

justify his release from custody.  He relies on the fact that there is a global emergency, namely,

COVID-19.  The risk of COVID-19 alone is not a condition that constitutes an extraordinary and

compelling reason for compassionate release.  He does not allege that he has COVID-19.  Nor

does he allege that he has been exposed to any individuals with COVID-19.  Instead, he is

seeking release based on the possibility of the existence of it and because of an underlying

medical condition.  The PSR outlined that medical condition and reflected the fact that the

Defendant was not prescribed any medication for that condition as of that time.  As such, at the

time of sentencing, this information was before the Court.  *See* PSR ¶109.  *Id.*  Defendant's

argument is based on speculation about what might happen if he were to contract COVID-19,

which is insufficient to establish the extraordinary and compelling circumstances necessary to

secure compassionate release.  Speculative claims about COVID-19 are insufficient.  While the

government appreciates the gravity of the COVID-19 pandemic and acknowledges that it

presents a national and state public health emergency, defendant's motion fails because the risk

of COVID-19 alone is not an "extraordinary and compelling reason" for compassionate release.

*See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-

19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Weeks*, 2020 WL 1862634 at *3 (S.D.N.Y April 14, 2020) ("Weeks has not set forth extraordinary and compelling reasons for him to be released early.  All he has done is to note that he is in prison and there is a COVID-19 outbreak nationwide.  That is not enough."); *United States v. Feiling*, 2020 WL 1821457 at *7 (E.D.VA. April 10, 2020) ("In the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility. … Notably, 'the *fear* of contracting a communicable disease' proves insufficient to justify a sentence modification.") (citation omitted); *United States v. Gillis*, 2020 WL 1846792 at *3 (C.D.CA April 9, 2020)("Absent the current COVID-19 crisis, [the defendant's] condition would come nowhere near the 'extraordinary compelling' standard required to justify permanent release from custody") (denying release).

Compassionate release on the basis of medical condition is a "rare" event and is limited. *United States v. Willis*, 382 F. Supp.3d 1185, 1188 (D.N.M. 2019); *United States v. Polnitz*, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) (must be extraordinary; "[m]any inmates suffer from pain and mental illness."); *United States v. Lynn*, 2019 WL 3082202 (S.D. Ala. July 15, 2019), *appeal dismissed,* 2019 WL 6273393 (11th Cir. Oct. 8, 2019) (compassionate release, sought on the basis of a variety of health ailments, is denied, as none affect the inmate's ability to function in a correctional environment). *Cannon v. United States*, 2019 WL 5580233, at *3 (S.D. Ala. Oct. 29, 2019) (the 71-year-old defendant suffers from significant back and stomach issues, as well as high blood pressure, diabetes, skin irritation, loss of hearing, and various other

complications, but relief is denied: "First, there is no indication that Cannon is terminally ill.

Second, despite the many medical afflictions Cannon identifies, he does not state, much less

provide evidence, that his conditions/impairments prevent him from providing self-care within

his correctional facility. Rather, the medical records provided by Cannon show that his many

conditions are being controlled with medication and there is no mention that his conditions are

escalating or preventing him from being from being able to provide self-care."). *See United*

*States v. Bunnell*, 2019 WL 6114599 (D. Ariz. Nov. 18, 2019) (the defendant has "serious

medical issues" – he "suffers from arthritis, sciatica, bulging lumbar discs 2-5, scoliosis, and

degenerative disease causing central stenosis in his spine," and is confined to a wheelchair – but

none of these are terminal illnesses or substantially diminish his ability to provide self-care

within the environment of a correctional facility). *See United States v. Korn*, 2020 WL 1808213,

at \*6 (W.D.N.Y. April 9, 2020) ("in this Court's view, the mere *possibility* of contracting a

communicable disease such as COVID-19, without any showing that the Bureau of Prisons will

not or cannot guard against or treat such a disease, does not constitute an extraordinary or

compelling reason for a sentence reduction under the statutory scheme").

    As to the extraordinary and compelling reasons, Defendant argues that he should be

released because COVID-19 presents a particularly serious risk to older people with pre-existing

medical conditions, such as he.  ECF No. 51 at p 3.  Defendant is currently 60 years old.  *See*

PSR at p.2. In Massachusetts, the rate of hospitalization for ages 60 is 269 per 100,000, and 104

deaths per 100,000.  *See* https://www.mass.gov/doc/covid-19-dashboard-july-9-2020/download

at pp. 15-16 (dated July 9, 2020 and last accessed November 6, 2020).

    Per Defendant's BOP medical records, attached to as Exhibit A to his Motion, as of

April 2020, Defendant's ███████ levels were within the normal range.  This was after the

14

Defendant completed his ███████████████ prescribed by medical staff at BOP.  *See*

Exhibit A, Defendant's medical records dated April 23, 2020.  The medical records demonstrate

Defendant has been receiving medical care by the BOP and, as demonstrated by his BOP

medical records, his levels have been monitored and he has been prescribed ██████ medications,

including medication to treat his █████████, while serving his current sentence at BOP.  Further,

he has not shown that his medial issues "substantially diminish his ability … to provide self-

care" within the correctional facility.  *See United States v. Gileno*, 2020 WL 1307108 at *4

(D.C. March 19, 2020).

Compassionate release has also been denied where short duration of sentence remains.

*See United States v. Willis*, 382 F. Supp. 3d 1185 (D.N.M. 2019) (the defendant suffers from a

terminal illness and meets the Sentencing Commission's criteria, but upon consideration of the §

3553(a) factors and particularly the short duration of the sentence (9 months) relief is denied);

*United States v. Allen*, 2019 WL 6529113, at *2 (E.D. Wash. Dec. 4, 2019) (the defendant's

mere dissatisfaction with her course of medical treatment in prison, combined with the very short

term of imprisonment remaining on her sentence, do not create such extraordinary and

compelling reasons as to justify a sentence reduction).  Here, the Defendant has failed to show

that his health conditions and COVID-19 on which he bases his claim constitute extraordinary

and compelling reasons to warrant a 10 month sentence reduction.

### III.    __The Bureau of Prisons Has Adequately Addressed the COVID-19 Pandemic__

In opposing the Defendant's motion, the government does not underestimate or minimize

the risks COVID-19 presents to the defendant, other prisoners serving prison sentences or being

detained pretrial, or the individuals who staff the facilities at which offenders are incarcerated.

The Department of Justice is mindful of the concerns created by COVID-19, which is why the

BOP is making extensive efforts to move as many appropriate inmates to home confinement as possible.  Since the release of the Attorney General's March 26, 2020 memorandum instructing BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, BOP has placed 7,978 inmates on home confinement.  https://www.bop.gov/coronavirus/ (last accessed November 11, 2020).  The Attorney General's memorandum directed BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors—particularly those at institutions where there have been COVID-19 outbreaks.  Attorney General Memorandum (Mar. 26, 2020), available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last accessed November 11, 2020).  Nevertheless, despite these initiatives, BOP determined defendant did not qualify for home confinement.

The BOP has adopted a plan across all of its facilities to address the risks posed by COVID-19 to highlight the most important measures for the proactive steps to prevent COVID-19 and the reactive steps if COVID-19 were to infect an inmate or correctional officer at BOP facilities.  Since at least October 2012, BOP has had a Pandemic Influenza Plan in place.  *See* BOP Health Management Resources, available at https://www.bop.gov/resources/health_care_mngmt.jsp.  In January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel.  *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission."  *Id.*  In addition, BOP set up "an agency task force" to study and coordinate its response to coronavirus/ COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and

directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President." *Id.*

On or about March 13, 2020, BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures were put in place to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, BOP implemented screening protocols for both BOP staff and inmates, with staff subject to "[e]nhanced health screening" and inmates subject to screening managed by BOP's infectious disease management programs. *Id.* As part of the inmate screening process, (a) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (b) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (c) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.* On or about March 18, 2020, BOP implemented Phase

Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19, available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_ covid19_update.pdf.

On or about March 26, 2020, BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require that all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.  *See* BOP COVID-19 Action Plan: Phase Five, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.  On or about April 1, 2020, BOP implemented Phase Five in order to mitigate the spread of COVID-19 which entailed: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the USMS to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording

limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System access.  *Id.*

On or about April 13, 2020, BOP implemented Phase Six, which extended all measures from Phase Five to May 18, 2020.  *See* BOP COVID-19 Action Plan: Phase Six, available at https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.  On or about April 24, 2020, BOP expanded its COVID-19 testing capabilities by distributing ten Abbott ID NOW instruments for Rapid RNA testing to facilities experiencing widespread transmission, with the goal of rapidly testing newly symptomatic inmates to quickly confirm their diagnosis, and of expanding testing on asymptomatic or pre-symptomatic inmates so that BOP can quickly isolate and quarantine sick individuals, thereby slowing transmission of the virus.  *See* BOP, Bureau of Prisons Expands COVID-19 Testing (Apr. 24, 2020), available at https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf.  BOP has since substantially expanded its testing for COVID with the acquisition of additional Abbott ID NOW instruments for Rapid RNA testing. *See* BOP, Bureau of Prisons to Expand Rapid Testing Capabilities (May 7, 2020), available at https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf.  On or about May 18, 2020, BOP implemented Phase Seven of its COVID-19 Action Plan, which extended all measures from Phase Six, including measures to contain movement and decrease the spread of the virus.  *See* Action Plan Phase Seven, available at https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.pdf.   Phase Seven was to remain in place through June 30, 2020.

On or about June 30, 2020, BOP implemented Phase Eight of its COVID-19 Action Plan, which extended all measures from Phase Seven, and included measures to address court trips for inmates, intakes, and movement between BOP institutions and was to remain in place through July

31, 2020. *See* Phase Eight Action Plan, available at https://www.bop.gov/foia/docs//COVIDPhase8.June30.pdf. On or about August 5, 2020, BOP implemented Phase Nine of its COVID-19 Action Plan, which extended all measures from Phase Eight, and included measures to suspend all in-person staff trainings (with some exceptions) and suspension of non-essential staff travel until August 31, 2020, legal access including legal calls/videos and in-person legal visits, resuming of inmate programming, compliance reviews, court trips, intakes and movement between BOP institutions. Phase Nine was to remain in place through August 31, 2020. *See* Phase Nine Action Plan, available at https://www.bop.gov/foia/docs//COVIDphase9_08052020.pdf.

On or about August 31, 2020, BOP extended Phase Nine of its COVID-19 Action Plan with a modification with regards to social visiting. The other aspects of Phase Nine remained in effect until September 30, 2020. Under the modification, social visiting was to occur no later than October 3, 2020, in accordance with BOP guidance. *See* https://www.bop.gov/coronavirus/covid19_status.jsp. Thereafter, BOP's modified operations plan, dated October 8, 2020, addressed a variety of implemented measures including one relating to movement of prisoners. That category was divided into three groups: (1) Inmates with no prior history of COVID-19: Prior to transfer, these inmates are tested with an approved test and, if negative, placed in release/transfer quarantine and housed separately from inmates in exposure or intake quarantine. Inmates remain in quarantine for a minimum of 14 days. They may be tested out of quarantine on Day 14 with a commercial PCR lab test; (2) Inmates previously diagnosed with COVID-19 who have since recovered, and have met the current criteria for release from isolation: Inmates who are more than 90 days since initial symptom-onset or positive test and have met criteria for release from medical isolation and are more than 90 days from their initial symptom

onset (for symptomatic cases) or initial positive COVID-19 test (for asymptomatic cases) are managed like inmates who have not had COVID-19 (see #1 above). [Note: Inmates with active COVID-19 who continue to require isolation are not released or transferred unless absolutely necessary (e.g., immediate release, completion of sentence)]; and (3) Immediate releases: An inmate being released who cannot be managed as described above under #1 and #2 because of statutory or judicial requirements is provided a symptom screen, temperature check, and rapid POC test on the day of departure. The local health authorities in the receiving locality are notified, and the travel arrangements coordinated with them, if necessary (e.g., if quarantine or isolation conditions are required during transportation or upon their arrival). The inmate is required to wear a face covering when departing the facility and while in route to their destination. *Id.* Per BOP Attorney Kerr, as BOP enters Month 8 of modified protocols, the protocols are pretty solidified and have continued to be extended with minor updates. The October 8, 2020, modified operations update on the BOP website accounts for the visitation update.

These steps belie any suggestion that BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates. They show that BOP has taken the threat seriously, is working to mitigate it, and continues to update policies and procedures in concert with the relevant facts and recommendations of experts. Further, Defendant has not demonstrated that BOP is unable to adequately care for him if he does contract the virus. *See United States v. Korn*, 2020 WL 1808213 (W.D.N.Y. April 9, 2020). The Defendant, moreover, has neither referenced nor demonstrated that the situation at Canaan UPS has even neared a crisis level, such that his health is at immediate risk. *See, e.g.*, *Gileno*, 2020 WL 1307108, at *4 ("With regard to the COVID-19 pandemic, Mr. Gileno has also not shown that the plan proposed by the [BOP] is inadequate to manage the pandemic within Mr.

Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno.").

IV.   **The § 3553(a) Factors Do Not Support The Proposed Time-Served Sentence.**

The government argues that there are no extraordinary and compelling circumstances for the defendant's release, that he is a safety risk and poses a danger to the community and the § 3553(a) factors do not support a reduction of his sentence.  The imposition of a time-served sentence is not appropriate under the factors set forth in § 3553(a), as required by § 3582(c).

CONCLUSION

Given all the circumstances, releasing the defendant back to the community does not meet the requirements of § 3582(c).  For the foregoing reasons, the Court should deny Defendant's motion.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Suzanne Sullivan Jacobus*
Suzanne Sullivan Jacobus
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on this date a redacted copy of the Government' Opposition to Defendant's Motion for Compassionate Release was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and an unredacted copy of same was electronically sent to counsel for the defendant, Attorney Michael Tumposky, Hedges & Tumposky, 15 Broad Street, Boston, MA 02109.

*/s/ Suzanne Sullivan Jacobus*
Suzanne Sullivan Jacobus
Assistant United States Attorney

Dated:  November 12, 2020